Filed 1/4/21  In re E.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | D077772 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J520063) |
| Plaintiff and Respondent, | |
| v. | |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and J. Jeffrey Bitticks, Deputy County Counsel, for Plaintiff and Respondent.

J.C. (Father) appeals from a contested six-month review hearing (Welf. & Inst. Code, § 366.21, subd. (e))[1] regarding his daughter, E.C. Father challenges the juvenile court's finding that he was provided with reasonable reunification services. We conclude that the court's finding is supported by substantial evidence and accordingly, affirm.

FACTUAL AND PROCEDURAL BACKGROUND

One night in June 2019, the manager of Father's apartment building heard yelling coming from the home where Father, eight-year-old E.C., and E.C.'s mother (Mother)[2] lived. Father and Mother were fighting with each other.

The next day, E.C. disclosed to her neighbor, who was babysitting her at the time, that her parents had been fighting the night before because Mother found Father "on top of E.C." E.C. indicated that Mother had caught Father inappropriately touching E.C. E.C. further told the neighbor that Father "measures her private areas to see how much she is growing," that the unwanted touching would occur when Mother was not present, and that E.C. wrapped herself "in a lot of blankets" at night to prevent Father from touching her while she was sleeping. The neighbor recorded E.C.'s statements on video and contacted law enforcement to report suspected sexual abuse.

Police officers responded to the family home. The neighbor informed the officers of E.C.'s statements, corroborated by the video. E.C. told the

---

[1]    Further unspecified statutory references are to the Welfare and Institutions Code.

[2]    Mother is not a party to this appeal, and our recitation of facts relating to her is accordingly limited. The parents have been in a relationship for over 20 years.

2

officers about Father's touching her private areas to "measure" her. When interacting with law enforcement officers, Mother seemed neither surprised nor upset that Father was suspected of sexually abusing E.C. The officers determined that E.C. should be taken to Polinsky Children's Center for her safety.

E.C. participated in a forensic interview at Rady Children's Chadwick Center, observed by a social worker from the San Diego County Health and Human Services Agency (Agency). In response to the forensic interviewer's open-ended questions, E.C. described in detail, using age-appropriate language, Father's touching her vagina, buttocks, and chest, and digitally penetrating her vagina, for the asserted reasons of "measuring" her or "checking" for hair. Father would perform his "measuring" of E.C. in her bedroom when Mother was not around. In E.C.'s words, Father "tells me to lay down on the bed when he measures me," "sometimes he wants to measure me late at night," "sometimes when I go to sleep he has to measure me," "he asks to take my pants and underwear off to measure me," "sometimes he has to look inside," and "he puts his fingers inside." E.C. said that it felt like Father was "tickling" her private parts, but he would deny this and tell her not to look. Father assured E.C. that he was " 'just measuring [her].' " On a picture depicting a girl, E.C. circled the body parts to which she referred during the interview. E.C. estimated that Father's conduct began when she was three or four years old, in preschool. She was eight years old and in second grade at the time of the interview.

In mid-June 2019, the Agency filed a petition on behalf of E.C., alleging that she had been, and was at substantial risk of being, sexually abused by Father. (§ 300, subd. (d).) The juvenile court detained E.C. out of the home and ordered Father to have "no contact" with her (no-contact order). Father

requested a referral to a sexual abuse class as soon as possible, which the court authorized.

The Agency's investigative efforts are detailed in several reports filed with the court. Father consistently claimed that he was innocent of any sexual misconduct, suggested that his daughter had imagined everything, and blamed other people who had interacted with E.C. For instance, Father believed that E.C. "was manipulated by the people who reported" the incident, that she may have been misunderstood by the forensic interviewer, and/or that the Agency was making false allegations. Father was nonetheless willing to participate in classes. Mother did not believe E.C.'s report of sexual abuse. Throughout the duration of the case, E.C. consistently maintained that Father had touched her in the manner she described. She cared about her father, but she "[did not] want him touching [her]."

After the detention hearing, the assigned social worker submitted a referral for Father to attend a sexual abuse group with a Spanish speaking provider.[3] The Agency's case plan described its safety goals for the parents— "that they will ensure E.C. is not sexually abused" and that they would be "supportive of E.C.'s mental health needs and believe her disclosures [of sexual abuse]." The Agency outlined relevant services for Father, including (1) sexual abuse therapy and (2) parenting education. In addition, the Agency was coordinating trauma therapy for E.C., supervised visitation (and other services) for Mother, and transportation and in-home services for the

---

[3] The parents were born in Mexico and are primarily Spanish speakers. They have lived in the United States for decades. E.C. is bilingual and fluent in English.

4

family. The Agency also held a child and family team meeting to discuss E.C.'s placement.

In July 2019, on the date scheduled for the jurisdictional and dispositional hearing, the matter was set for trial. Father's counsel reported that Father had not yet received information about a sexual abuse class. The Agency's counsel responded that the social worker had submitted the requested referral but was having difficulty finding Spanish speaking sexual abuse therapists. The social worker was tracking the issue. The court confirmed all prior orders.

On the date of the pretrial status conference, the Agency filed an addendum report with an update on services. Father would attend a sexual abuse group led by an English speaking therapist, with an interpreter who would translate for him in Spanish. Regarding visitation, E.C.'s therapist (Linda Jeter) opined that E.C. was suffering from trauma-induced symptoms ("hypervigilance . . . nightmares, intrusive and distressing thoughts and negative alterations in cognition") and that "it would be highly detrimental for [E.C.] to have contact with her father at least until she is stabilized." Attached to the Agency's addendum report was (1) the family's case plan in Spanish, (2) the therapist's letter, and (3) E.C.'s individualized education program (IEP) from school. E.C. had some attention deficits, but her speech was not an area of concern. With respect to communication skills, the IEP states, "E.C. communicates clearly." The court confirmed the trial set.

On August 21, 2019, following a document trial on the jurisdictional and dispositional issues, the court made a true finding on the petition by clear and convincing evidence and removed E.C. from parental custody. The court continued its no-contact order as to Father, indicating that it was placing great weight on the opinion of E.C.'s therapist. Observing that

5

visitation would likely have to take place in a therapeutic setting, the court granted the Agency discretion to lift the no-contact order provided that E.C.'s therapist approved and E.C.'s counsel (minor's counsel) concurred. Six- and 12-month review hearings were set.

In September 2019, Father began participating in sexual offender group therapy led by Dr. James Reavis, with the assistance of a Spanish speaking interpreter. After attending eight sessions, Father was discharged. Dr. Reavis observed that, during their sessions, Father "said little, apart from maintaining his innocence . . . ." Given "difficulties with the English language and [the] client's protestations of innocence," Dr. Reavis believed that Father would be "better served" in an individual treatment format, by a Spanish speaker or with interpretation.

In October 2019, an Agency social worker, Ashley Tapia, submitted referrals to OPTUM[4] for individual therapy for Father. Tapia proceeded to follow up with OPTUM eight times via telephone and four times via e-mail. OPTUM explained that Father's treatment required a therapist certified by the California Sex Offender Management Board (CASOMB). Because OPTUM did not have any Spanish speaking CASOMB-certified therapists on its panel of providers, it had to conduct an off-panel search.[5] In December 2019, OPTUM identified therapist Dr. Ca-Lie Cheng-Wang (Dr. Wang), who did not speak Spanish but could treat Father with the assistance of an interpreter. Dr. Wang would be working under the supervision of Dr. Todd

---

[4]   OPTUM is the entity that finds suitably qualified health care providers for the families served by the Agency.

[5]   An "off-panel" therapist is someone who does not have an existing contract with OPTUM.

6

D. Pizitz, who possessed the requisite CASOMB certification. Father began individual therapy with Dr. Wang in January 2020.

The Agency also gave Father a list of community resources, including parenting and individual counseling, and told him that he could call to inquire about availability of a parenting class if he wanted to begin participating in services as soon as possible. In November 2019, Father completed the intake process for a group parenting class that would be conducted in Spanish. As an exercise to encourage empathy with E.C., social worker Tapia asked Father to write a letter to E.C. from her perspective, i.e., assuming that she had been a victim of sexual abuse. Father wrote two letters, neither of which acknowledged E.C.'s disclosures of molestation nor his role in the matter. In January 2020, Father began his parenting class.

In early February 2020, the Agency held a child and family team meeting. At the meeting, Father maintained that he was innocent and that E.C. was a "liar," citing past misbehavior at home. He insisted that E.C. should be evaluated by a psychiatrist for "lying child syndrome" and denied that his daughter had suffered any trauma. Father blamed his neighbor for manipulating E.C. and claimed that the Chadwick forensic interviewer was unqualified, misleading, and had coached E.C. on what to say beforehand. Mother agreed with Father's sentiments.

Meanwhile, E.C. was continuing her individual therapy. Between July and December 2019, E.C. participated in weekly sessions with Linda Jeter of Comprehensive Assessment and Stabilization Services (CASS), a provider of short-term services. In late January 2020, E.C. began individual therapy at her school site with Helen Patterson of Family Wellness Center.

On February 19, 2020, the date scheduled for the six-month review hearing, Father requested a trial on the issue of the reasonableness of

7

services provided. The court scheduled a contested hearing date in April, which was later vacated per the parties' stipulation due to the COVID-19 pandemic and related court closure.[6]

In addendum reports, the Agency provided the court with updates on the services that had been provided to the family. E.C. was reportedly furious after seeing her father at the February court hearing. She told her caregiver, "I wish he wasn't my dad, I just want him to tell the truth." E.C. worked with therapist Patterson to process her emotions. In March 2020, E.C. asked the social worker when she would begin conjoint therapy with her father, "because I want to tell him 'I hate you.' " E.C. also proposed a visit with her father, "like in jail, like where you sit down and there's a wall between you and a phone[.]" The social worker discussed the issue of conjoint therapy with E.C.'s therapist, who stated that she needed more time to assess E.C. and "prepare her for the confrontation." In addition, Patterson did not speak Spanish; she believed that it would be necessary to have a Spanish speaking therapist to facilitate joint sessions.

In late April 2020, the Agency transitioned E.C. to a new bilingual therapist (Andrea Gotschalk). In May, Gotschalk believed that E.C. was ready for conjoint therapy with her mother. The first session in June was a difficult one for both mother and daughter, and the therapist had to terminate the session early. Mother accused E.C. of lying during the session, which upset E.C. The second session was better, however, and E.C. was open to continuing therapy with Mother. The Agency remained concerned about Mother's lack of insight into the protective issues.

---

[6] The trial on the issue of reasonableness of services was reset for July 2020.

8

Regarding Father, he completed most of his parenting class by March 2020. He also attended individual therapy sessions with Dr. Wang on a weekly basis, using the services of an interpreter.[7] The Agency identified a Spanish speaking therapist for Father, but that therapist was available only in the mornings, which conflicted with Father's work schedule. Father opted to continue his sessions with Dr. Wang. By the time of the Agency's addendum report dated in early July 2020, Father had completed 21 sessions with Dr. Wang.

Father reported to the Agency that his individual therapy sessions were going well despite some initial translation difficulties, and that he was able to engage in a productive dialogue with Dr. Wang. Father's updated treatment plan, signed by Drs. Wang and Pizitz, showed that Father had met various goals, such as "increase understanding of the potential effects of sexual abuse . . . ." Nevertheless, his therapist noted that Father was not empathetic toward his daughter's plight and instead, was focused on proving his innocence. Father's lack of empathy was exemplified by his expressed desire to have E.C. subjected to a polygraph examination to prove that she was a liar. He characterized his daughter as a "pathological liar" and blamed her for "everything."

In the Agency's assessment, Father continued to lack insight into the protective issues concerning E.C. He expressed no concern for her welfare and declared that "E.C. has not endured any kind of abuse by anyone." Father maintained that his daughter, the reporting neighbor, the forensic interviewer, and even the social workers, were lying and/or conspiring

---

7    Some of Father's sessions were telephonic due to COVID-19 emergency restrictions. He consented to having therapy sessions conducted telephonically.

against him.  He accused the Agency of kidnapping, corruption, and incompetence.

The contested six-month review hearing took place in early July 2020. The juvenile court received the Agency's reports in evidence without objection.  The court also heard testimony from social worker Tapia, which was consistent with her reports.  She described the family's progress in services.  Tapia explained why the Agency had not yet lifted Father's no-contact order—his lack of empathy and lack of insight into E.C.'s emotional trauma.  The social worker acknowledged that one of Father's interpreters had not been very helpful but testified that that interpreter was used for only one week and that the Agency relied on an intermediary to provide translation services.

After considering the evidence and counsel's arguments, the juvenile court found, by clear and convincing evidence, that Father had been provided with reasonable reunification services.  The court noted that the Agency's provision of services was constrained by limited resources "in the real world," that services were often imperfect or less than ideal, and that there simply may "not be enough Spanish-speaking qualified therapists available[.]"  The court continued the parents' reunification services until the 12-month hearing, and E.C. remained placed in foster care.

Father's appeal followed.

## DISCUSSION

When a child is removed from parental custody, the juvenile court ordinarily orders reunification services for the parents.  (§ 361.5.)  The purpose of reunification services is to remedy the problems that led to the child's removal.  (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362; *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 173.)  Services are considered

10

reasonable if the child welfare agency has " 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents . . . .' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972 (*Alvin R.*); *In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) When a party challenges the finding that reasonable services were offered or provided, we determine whether there is substantial evidence to support the court's finding by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46; *Misako R.*, at p. 545.) We conduct our substantial evidence review bearing in mind the required clear and convincing standard of proof. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1239 (*T.J.*).)

There is no dispute in this case that the Agency identified the problems leading to E.C.'s removal, designed a suitable reunification plan to address these problems, and maintained reasonable contact with Father throughout the case. Father chiefly complains about two aspects of his services: (1) delays in providing him with sexual abuse treatment and (2) lack of conjoint therapy between him and E.C. We discuss these areas in turn and conclude that substantial evidence supports the juvenile court's finding that Father was offered or provided with reasonable reunification services.

11

*Sexual Abuse Treatment*

The Agency's early efforts to provide Father with therapy were hindered by the unavailability of qualified Spanish speaking providers. The Agency made timely referrals, and there was no lack of effort in trying to find a provider. Reunification services are not normally required until after a child's dispositional hearing (§ 361.5, subd. (a)), and the contested hearing in this case did not occur until August 21, 2019. Soon thereafter, Father was in group therapy with Dr. Reavis. Father attended eight sessions with Dr. Reavis. Although the use of an interpreter during therapy was not ideal, because no Spanish speaking therapists were available, this was a reasonable accommodation under the circumstances. (*Misako, supra*, 2 Cal.App.4th at p. 546 [use of interpreter for Korean parent].) After Father's discharge from group therapy, the Agency continued its search for a Spanish speaking individual therapist but was again stymied by systemic limitations. Social worker Tapia was keenly aware of the situation and was in frequent contact with OPTUM. The Agency paired Father with Dr. Wang in due course, and by the time of the contested six-month review hearing, he had completed 21 sessions of individual therapy with her. Dr. Wang did not speak Spanish, but Father was able to communicate with her through the assistance of a Spanish speaking interpreter.

For the first time on appeal, Father attacks Dr. Wang's credentials, claiming that she was not a licensed psychologist or certified by CASOMB. This claim is forfeited (*In re M.H.* (2016) 1 Cal.App.5th 699, 714 (*M.H.*)), and in any event, unfounded. The record supports that Dr. Wang maintained appropriate licensure, and as Father concedes, she worked under the supervision of Dr. Pizitz, who was a CASOMB-certified psychologist.

Father also claims for the first time on appeal that he could have been treated by one of at least "three to four other CASOMB-certified providers" in San Diego that offered Spanish language services. This claim is likewise forfeited (*M.H.*, *supra*, 1 Cal.App.5th at p. 714), and regardless, lacks merit. The record contains very little information on the number or availability of other Spanish speaking CASOMB-certified providers in San Diego. The record discloses only that OPTUM could not find any Spanish speaking certified providers on its panel and that, off-panel, OPTUM found only one Spanish speaking therapist, who was affiliated with Dr. Pizitz's office. However, that therapist was available in the mornings only, which Father said conflicted with his work schedule. To the extent that other qualified Spanish speaking providers existed, it is reasonable to infer that they were unavailable or unwilling to accept new patients. The Agency's assigning Father to Dr. Wang for individual therapy was reasonable under the circumstances.

Father further faults the Agency for halting its efforts to find a Spanish speaking therapist after he began treatment with Dr. Wang. However, Father's work schedule could not accommodate the only Spanish speaking therapist that the Agency had been able to identify to date, and Dr. Wang was making headway with Father. She challenged his distorted thoughts, which he reported made him feel uncomfortable, but he understood that that was Dr. Wang's role as a therapist. By all accounts, Father continued to engage in a productive dialogue with her.

Similarly, we find no merit in Father's contention that there was an unreasonable delay in providing him with parenting education. In the fall of 2019, Father was given a list of parenting resources and instructions as to how to proceed. Social worker Tapia diligently followed up on getting him

enrolled in a Spanish group parenting class, which he completed by April 2020. The provision of parenting education was reasonable.

Father cites *T.J.*, *supra*, 21 Cal.App.5th 1229, to support his contention that the Agency unreasonably delayed in providing him services. *T.J.* was a neglect case involving an intellectually disabled single mother. (*Id.* at pp. 1232, 1250.) At the six-month mark, the mother had been provided with "no actual services" except visitation and referrals to services. (*Id.* at p. 1242.) One of the referrals was to a regional center for developmentally disabled individuals, but it was "so backed up that it [could] not help a parent within a reasonable time." (*Id.* at p. 1243.) The court in *T.J.* discussed that in such a case, "the Agency should pursue other possible avenues for obtaining needed services promptly on the parent's behalf." (*Ibid.*) Further, "[b]y placing her on a six- to 12-month waiting list for individual therapy, and then waiting four more months before making an alternate appropriate referral, the Agency failed to address with timely services the root of the problem." (*Id.* at p. 1244.)

*T.J.* is readily distinguishable. In this case, referrals to services were made prior to the court's assuming jurisdiction. Father was enrolled in sexual abuse group therapy shortly after E.C.'s removal. He also attended a parenting class. By the six-month mark, he was engaged in individual therapy and his parenting class was well underway. Moreover, the Agency clearly recognized that Father's primary language is Spanish. Social worker Tapia is bilingual and communicated with him in Spanish. The Agency provided him with a parenting class in Spanish and procured personal Spanish interpreters to enable him to access individual therapy. Substantial evidence supports that Father was able to understand and communicate with his therapists, even if he did not believe that some of their comments applied

to him. Although a Spanish speaking therapist may have been preferable, the "standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable[.]" (*Misako R., supra,* 2 Cal.App.4th at p. 547.) The juvenile court's reasonable services finding with respect to therapy and a parenting class is supported by substantial evidence.

*Conjoint Therapy*

Father next argues that the Agency did not make good faith efforts to provide conjoint therapy to him and E.C. He complains that E.C. did not receive individual therapy for a period of time between December 2019 and January 2020 and that if she had, she would have been prepared for conjoint therapy with him in February 2020.

We disagree with Father's assertions regarding conjoint therapy. Substantial evidence supports that the Agency provided reasonable services with respect to E.C.'s individual therapy and further, that it made good faith efforts toward achieving conjoint therapy.

Shortly after Father's sexual abuse of E.C. came to light, she began trauma therapy. In late July 2019, clinician Jeter stated that "this is an extreme/complex case of alleged sexual abuse in terms of duration, intensity and frequency. Continued exposure to [Father] may exacerbate [E.C.'s] symptoms and prolong her healing process given the difficulty [she] is having remaining stable. . . . As a trauma trained therapist[,] I am not sure of how many layers of trauma this client has experienced." Jeter reported E.C.'s historical diagnosis of posttraumatic stress disorder, her current diagnosis of adjustment disorder with anxiety, and a number of disturbances that E.C. was experiencing. Jeter was of the view that it would be "highly detrimental" for E.C. to have contact with her father until she was stabilized.

15

Toward the end of 2019, as Jeter was preparing to close out E.C.'s case,[8] she communicated to the social worker that E.C. was willing to see her father if the social worker would be present during the visit. Jeter recommended that any short, structured visit occur in a therapeutic setting. Tapia explained at trial that the Agency chose not to lift the no-contact order at that point because it wanted E.C. to be established with her next therapist prior to any contact with Father. E.C. began treatment with her new therapist (Patterson) in late January 2020,[9] and a short time later, E.C. became destabilized after seeing her father in court. E.C. worked with Patterson to process her emotions. It is apparent from our review of the record that E.C. became emotionally disturbed when either of her parents expressed disbelief regarding her disclosures of sexual abuse. Months later, E.C. regressed again when her mother said that she did not believe her.

Accordingly, the Agency acted reasonably in not pressing E.C. into conjoint therapy with Father in February 2020, or thereafter. Throughout the case, Father was vehement in his denials of E.C.'s claims and blamed her for "everything." If given the choice, he indicated repeatedly that he would subject E.C. to drastic measures such as requiring her to submit to a polygraph examination, to prove that she was lying. He was unable or unwilling to empathize with her. Moreover, E.C. held deep-seated feelings of

---

[8]   CASS is a provider of short-term services only.

[9]   Father claims that the Agency knowingly "drag[ged] its feet" in finding E.C. a new therapist. There is no support in the record for this claim beyond the time gap, itself. E.C. was relatively stable at that point, and there was no emergent crisis. Between December and January, schools are traditionally closed for winter break; therapist Patterson eventually treated E.C. at her school site. There may have been plausible reasons related to programming, scheduling, and logistics, for why E.C. could not be earlier seen.

mistrust and dislike toward Father; as he acknowledges, E.C. frequently vacillated as to whether, when, and under what circumstances she would agree to meet with him. In February 2020, in open court, E.C. passionately asked of all who were present, "Why can't my dad tell the truth?" Contact between E.C. and Father was likely to be confrontational, highly emotional, and potentially traumatic. The Agency did not abuse its discretion in deciding to continue the no-contact order.

Father cites *Alvin R.*, *supra*, 108 Cal.App.4th at pages 971-973, to support his contention that the Agency's efforts to provide conjoint therapy were lacking. In that case, the father's conjoint counseling was conditioned on the child's completion of eight sessions of individual counseling, but the Agency was dilatory in getting Alvin into individual counseling. (*Id.* at p. 965.) The welfare agency failed to effectively accommodate his need to see a therapist near his caregiver's home. (*Id.* at p. 973.) The agency's reports were also deficient as to the issue of "reasonable efforts." (*Id.* at p. 972.) Finally, the father had done everything required of him and recognized that his past disciplinary measures had been excessive. (*Id.* at pp. 970, 973.) *Alvin R.* bears little factual similarity to this case. As we have discussed, in this case, the Agency made reasonable efforts with respect to both Father's and E.C.'s services, but determined, in its discretion, that conjoint therapy was not yet appropriate.

This case is also distinguishable from *Serena M. v. Superior Court of Fresno County* (2020) 52 Cal.App.5th 659, 677, cited by Father. There, the juvenile court maintained a no-contact order between the mother and child for the duration of the 18-month reunification period and did not give the child welfare department any discretion to lift the order. (*Id.* at pp. 675-676, 677-678.) In contrast, the juvenile court in the present case gave the Agency

discretion to lift the no-contact order as long as E.C.'s therapist and minor's counsel agreed. However, the conditions for lifting the no-contact order were not met. E.C.'s therapist did not give unqualified approval for conjoint therapy, minor's counsel did not agree to lift the no-contact order, and the Agency had well-founded concerns about E.C.'s emotional well-being and Father's clear lack of insight.

In summary, Father has failed to establish that the Agency's efforts regarding E.C.'s individual therapy or conjoint therapy were lacking. Substantial evidence supports that the Agency provided Father with reasonable reunification services.

DISPOSITION

The court's findings and order are affirmed.

AARON, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

18